UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**ERIC JENICH,**

   Plaintiff,

v.                                  Case No.       21-C-425

**KILOLO KIJAKAZI,**
**Commissioner of Social Security,**

   Defendant.

---

### DECISION AND ORDER

---

Eric Jenich seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's decision will be affirmed.

### BACKGROUND

The plaintiff's disability claim is based on neck and arm pain, paresthesia in his upper and lower extremities, as well as mental health issues including anxiety disorder. The plaintiff appeared before an administrative law judge (ALJ) on two occasions, both of which resulted in unfavorable decisions.

At the most recent hearing, the ALJ asked a vocational expert (VE) a hypothetical question regarding an individual capable of sedentary work with certain limitations, including the use of foot controls, a sit / stand option, and mental / social limitations. The VE testified that such an individual could perform jobs including ink printer, document preparer, and hand mounter, all of which were available in significant numbers throughout the national

economy. When questioned about his data, the VE explained that his numbers came from software called OccuBrowse+, as well as the Standard Occupational Classifications (SOC) and the Dictionary of Occupational Titles (DOT). In determining the number of ink printer and hand mounter jobs that would be available, the VE used what he called a proportional distribution method, taking 5% or 10% of the numbers produced by the OccuBrowse+ software as using them as a conservative estimate. For the document preparer position, the VE used the equal distribution method, which involved dividing the number of positions for the SOC code by the number of DOT job titles within that code. The VE also explained that his figures were a product of his experience and observations in Ohio, West Virginia and Pennsylvania, as well as other regions throughout the national economy. R. 113.

## ANALYSIS

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported [her] decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from

the evidence to [her] conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's ("SSA") rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**A. Document Preparer**

Jenich focuses his appeal on the VE's methods for arriving at job figures for available jobs. His first challenge is to the VE's use of the so-called equal distribution method, by which the VE arrived at 44,000 document preparer jobs. Using that method, the VE divided the total number of jobs provided for the SOC code by the number of DOT titles within that code grouping. As I have noted previously, "[t]he equal distribution method relies upon the premise that each occupational title within a particular occupational category represents an equal number of positions available in the national economy." *Sickinger v. Saul,* No. 19-CV-1489, 2020 WL 4582247, at *4 (E.D. Wis. Aug. 7, 2020). "For example, one title could have 5,000 jobs in the economy, while another could have 250,000, and yet they are essentially counted the same under the equal distribution method." *Id.* Addressing this objection head-

3

on, the ALJ found that the equal distribution method was acceptable here because it has not been ruled "impermissible" by reviewing courts and that, in this case, the VE "provided a sufficient basis for the numbers he cited. He described the formulas underlying these methods and how he used them in this case. He explained that he also relied upon his research, training/consultation with peers and experience." R. 33.

Jenich finds this explanation wanting. The fact that the VE explained his methodology, and the ALJ understood it, does not necessarily mean that the methodology is sound. Moreover, Jenich argues that the job of document preparer—which involves transferring documents to microfilm—is clearly obsolete, a fact which further underscores the unreliability of the VE's methodology.

It's clear that the equal distribution method, standing on its own, would not suffice to produce a reliable job estimate. The VE must explain why, in this specific case, it would be reasonable to use that method as a rough way to estimate job numbers. The Seventh Circuit has explained that "The VE, for example, could have drawn on his past experience with the equal distribution method, knowledge of national or local job markets, or practical learning from assisting people with locating jobs throughout the region, to offer an informed view on the reasonableness of his estimates." *Chavez v. Berryhill,* 895 F.3d 962, 969 (7th Cir. 2018).

Here, the ALJ questioned the VE about his methods, clarifying that the VE used proportional distribution for the ink printer and hand mounter jobs, and equal distribution for the document preparer job. R. 112-113. The ALJ then asked, "why do you find the numbers that you cited . . . to be reliable? What in your experience allows you to make that conclusion?" R. 113. The VE answered that his conclusions were based on SkillTRAN "and my experience," as well as "the positions [as] I've observed them in the Tri-State area of Ohio,

4

West Virginia and Pennsylvania. And I know these jobs exist in several regions of the national economy." *Id.* When pressed by counsel as to how he could extrapolate these jobs to the rest of the economy, the VE explained that "I only use jobs that are readily available in all regions of the country," based on his "research and experience." R 116.

Based on these answers, the ALJ concluded that the VE was entitled to rely on his experience, training and research. R. 33. "Mr. Wright has extensive experience in the field of vocational rehabilitation per his resume in the file and has experience observing individuals performing the jobs he cited per his testimony. While he may not have national experience, he testified that he also relied upon research and professional contacts and conferences in arriving at his conclusions." *Id.* This was enough to satisfy *Chavez's* requirement that a VE explain why his method was viable. Here, the VE stated that he relied on his knowledge of job markets and, based on his experience and "positions [as] I've observed them," it was reasonable to extrapolate from the Tri-State area to the rest of the economy. That's what *Chavez* requires. 895 F.3d at 969 (requiring explanation to be based on knowledge of national or local job markets, experience, etc.) *Cf. Gallegos v. Saul,* No. 19-CV-1642-SCD, 2020 WL 5820597, at *6 (E.D. Wis. Sept. 30, 2020) ("The VE never cited his education, training, or experience as the basis for his job-number estimates.")

Jenich also argues that the document preparer job, which involves transferring data to microfilm, is so clearly outdated that it essentially fails the laugh test. However, the VE pushed back hard against that suggestion. When asked whether the position had substantially changed since the last time the position was updated, the VE said, "Actually, Counsel, that position is making a resurgence due to the storage of files like Iron Mountain, things of that nature." R. 114-15. Counsel pressed further: "You're saying microfilming is making a

5

resurgence?" The VE explained that "It is taking [sic] a resurgence. Backing up – there's much more data that they can put onto a microfilm than they can regular paper, and longevity, it lasts up to 99 years or something like that." R. 115. The VE finally explained that the process was being used by Fortune 500 companies like Microsoft, as well as libraries and newspapers. R. 115.

Although counsel appeared (and continues to appear) incredulous that there is a resurgence in document preparer jobs, the VE is the expert on jobs and he provided rather detailed information about the document preparer position, to the extent he was able to respond to counsel's doubts by explaining that microfilm storage is making a comeback. He named names—Microsoft, Iron Mountain—even if he did not have the opportunity to elaborate. He also explained *why* there was a resurgence, namely, that microfilm lasts 99 years and can hold a large amount of data.[1] Finally, he stated that he had actually observed the position. R. 113. The plaintiff cites several judicial opinions expressing skeptical views about the document preparer position, but those opinions do not have the benefit of the information provided by the VE in this case. The plaintiff also relies on *Gulley v. Berryhill,* No. 17-CV-1782, 2019 WL 668836, at *4 (E.D. Wis. Feb. 19, 2019), where the court expressed skepticism that nearly 100,000 document preparer jobs existed in the economy. In that case, however, there was no indication that the ALJ had probed the basis for the VE's conclusions. The court thus found it was error when the ALJ "uncritically accepts the job numbers proffered by the vocational expert without attempting to determine whether the numbers are still current when

---

[1] I note that, according to the National Archives, "microfilm is a low-cost, reliable, long-term, standardized image storage medium. The equipment needed to view microfilm images is simple, consisting of light and magnification. The medium has a life-expectancy of hundreds of years. Digital images, on the other hand, consist of a wide variety of machine codes that require computer hardware and software to be made visible. To avoid the obsolescence of changing computer technology, digital images must be reformatted periodically." https://www.archives.gov/preservation/formats/microfilming.html, last visited August 24, 2022.

6

Case 2:21-cv-00425-SCD    Filed 08/24/22    Page 6 of 8    Document 32

common sense suggests that they may not be." *Id.* That's the opposite of what happened here. The ALJ (and plaintiff's counsel) pressed the VE to explain his numbers, and the VE provided a valid explanation. It is not a reviewing court's role to reweigh evidence or substitute its judgment for that of the ALJ. Instead, the court must determine whether the ALJ complied with his obligation to build an "accurate and logical bridge" between the evidence and his conclusion that is sufficient to enable a court to review the administrative findings. *Beardsley v. Colvin,* 758 F.3d 834, 837 (7th Cir. 2014). Here, that bridge has been built. It was therefore not error to rely on the VE's testimony that some 44,000 document preparer positions would exist.

### B. Other Positions

Jenich also challenges the ALJ's acceptance of the VE's use of the proportional distribution method. For the DOT titles of hand mounter and ink printer, the VE stated that he took 5% or 10% of the total number of jobs provided by the OccuBrowse software. R. 113, 116. When asked what is "special" about five or ten percent, the VE explained that "I found it to be not only in fairness, it gives a conservative number, and it's based on my experience as well." R. 116. Using this method, the VE estimated that there would be 17,000 ink printer positions nationally, as well as 11,000 hand mounter positions. R. 108-09.

Jenich argues that the "5% or 10% method" used by the VE is even less reliable than the equal distribution method because it would imply that *all* jobs exist in amounts equal to either five or ten percent of their larger group total. Whether that's true or not, the VE did not explain whether he actually multiplied by five or ten percent or how he made that decision. The transcript suggests instead that the VE simply used five or ten percent as a ballpark means of reducing job totals to produce what he called a conservative estimate. But that's not

7

enough. In a previous case, for example, I found that "The VE here testified that he applied a reduction of about fifty percent to each of the job numbers he extrapolated from the OES. However, he failed to explain how this crude methodology yielded sufficiently accurate job-number estimates." *Gallegos v. Saul,* No. 19-CV-1642-SCD, 2020 WL 5820597, at *5 (E.D. Wis. Sept. 30, 2020). The same holds true here—there is no explanation for why five or ten percent would produce a reliable number. But, because the ALJ's conclusion regarding document preparer jobs was supported by the evidence, any error with respect to the other positions is harmless.

## CONCLUSION

The decision of the Commissioner is affirmed. The clerk will enter judgment accordingly.

**SO ORDERED** this 24th of August, 2022.

_____
STEPHEN C. DRIES
United States Magistrate Judge